ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

M. BRIDGET MINDER
Assistant U.S. Attorney
Arizona State Bar No. 23356
Email: mary.minder@usdoj.gov

PETER SEXTON
Assistant U.S. Attorney
Arizona State Bar No. 11089
Email: peter.sexton@usdoj.gov

Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>   vs.<br><br>Deborah Ann Weidenhamer,<br><br>            Defendant. | NO.  CR-16-01072-PHX-ROS<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM** |

The government requests a sentence of seven years.  That is a below-Guidelines sentence which would require a two-level variance based on defendant's quick resolution of the matter and her other cooperation, as well as her numerous other positive attributes.

Surprisingly, defendant seeks a probationary sentence even though she is ineligible. That request also ignores the scope and length of her crimes.  For a decade, defendant engaged in a complex scheme that ultimately defrauded two banks out of more than $50 million.  While some variance is fitting, probation would be inappropriate. A seven-year sentence is sufficient but not greater than necessary to reflect the seriousness of her offense, promote respect for the law, provide just punishment, and afford adequate deterrence.

## I. The Sentencing Guidelines range and statutory authority support a significant term of incarceration.

The Presentence Investigation Report (PSR) calculates a total offense level of 30, and a criminal history category of I, which results in a Sentencing Guidelines range of 97-121 months' imprisonment. PSR ¶¶ 26-42 (doc. 45). The maximum term of imprisonment for each count of bank fraud is 30 years. 18 U.S.C. § 1344. Defendant is not eligible for probation because bank fraud is a Class B felony. *See* 18 U.S.C. §§ 3559, 3561.

The government requests a sentence of 84 months for each of the seven bank fraud counts, with the sentences on all counts to be served concurrently. A sentence of 84 months requires a downward variance of two levels from the applicable Sentencing Guidelines range and corresponds to a 13-month reduction from the low end of the range.

The PSR recommends a sentence of 60 months. PSR at 17 (doc. 45). A sentence of 60 months requires a downward variance of five levels from the applicable Sentencing Guidelines range and corresponds to a 37-month reduction from the low end of the range.

## II. The § 3553(a) factors support a significant term of incarceration.

The PSR's recommended sentence of 60 months is not unreasonable. The government agrees with many of the PSR's justifications for such a variance. The government believes, however, that a sentence of 84 months more appropriately balances defendant's recent cooperation, history, and characteristics, on the one hand, with the very serious and long-running nature of her offense, on the other hand. The government also believes that a sentence of 84 months better reflects the need to promote respect for the law, provide just punishment, afford adequate deterrence, and avoid unwarranted sentence disparities.

### A. Defendant's history and characteristics

Defendant's history and characteristics are admirable in many respects. As detailed in the PSR and defendant's sentencing memorandum, for the last twenty years defendant has worked hard, volunteered in the community, and provided financial support to charitable causes and churches. Before beginning her long-running scheme, defendant led

a productive, law-abiding life. She still has support from family, friends, and former employees, as evidenced by the many character letters submitted on her behalf. She confessed her conduct soon after the banks discovered her scheme, entered into a pre-indictment resolution, and complied with various requests for information from the government.

While she deserves credit for her hard work, community spirit, and kindness to others, defendant ignores some of the less flattering underpinnings of that goodwill. For example, defendant's sentencing memorandum and character letters talk about the early success of her business. But it is unclear whether defendant's business was ever successful. Even when defendant's business was admittedly failing, defendant repeatedly lied about its solvency and publicized herself as an extraordinarily successful business person.[1]

In addition, defendant professes to care deeply about her former employees and many of them submitted letters on her behalf. Yet defendant involved her unwitting employees in her massive fraud for years, making them dependent on a failed business. Moreover, defendant's generosity to her employees was possible only because of the bank funds she got through her fraudulent scheme.

Similarly, defendant's sentencing memorandum also talks at length about her good work in the community, including her regular donations to churches and various charitable

---

[1] For example, in a November 2015 BBC News article—just a month or two before the banks caught on to her decade-long scheme—defendant claimed that her 2014 sales were $245 million. *See* http://www.bbc.com/news/business-34774960. In a June 2015 Arizona Republic article, defendant claimed she was running a $200 million company. *See* http://www.azcentral.com/story/money/business/2015/06/17/whos-who-2015-deb-weidenhamer/71262258/. In a September 2013 New York Times article, defendant claimed that her business had $135 million in annual revenue. *See* http://www.nytimes.com/2013/09/05/business/smallbusiness/a-pioneering-auction-company-keeps-innovating.html. Defendant even had her own reality TV show, called "Auctioneer$," on The Learning Channel in 2010, well after her business started failing, in which she portrayed herself as being the head of one of the busiest auction houses in the country. *See* http://www.prweb.com/releases/tlc-auctioneers/auction-systems-phoenix/prweb4595694.htm. Throughout the time she was making these claims, her revenues were only a few million and her losses were far greater.

causes. Again, it is disingenuous for defendant to attempt to mitigate her conduct by pointing to good deeds that were funded by her fraudulent scheme.

### B. The nature and circumstances of the offense, promoting respect for the law, and providing just punishment

Defendant's offense is summarized at a high level in the factual basis of her plea agreement and the PSR. Some additional details are helpful, however, to understand the full nature and circumstances of her offense. First, defendant did not just make a "poor choice" or do a "dumb thing," as her sentencing memorandum suggests. She made hundreds (if not thousands) of poor choices and false statements over the course of a decade, to numerous people and companies. She lied to multiple banks. She lied to outside auditors and her CPA. She lied to her employees, her friends, and her family.

In many ways, defendant lived a double life for ten years. Her public persona was that of a successful international entrepreneur but, in secret, she was running a massive fraud. She kept two separate sets of books for her companies—one set that reflected the true finances of her failing business and another (bogus) set that portrayed her company as having hundreds of millions in revenue. She fabricated countless documents that she provided to banks as part of her scheme, including fraudulent loan applications, doctored bank statements, false tax returns, and other fictitious financial documents. She also filed false tax returns with the IRS, which her CPA unknowingly prepared based on the bogus set of books she provided him. Defendant ensured that her tax liability did not increase by fabricating increased expenses each year to offset her purportedly increasing revenue.

It is also important to consider not just the volume and duration of defendant's lies, but the magnitude. Defendant did not just round up a number here and there, or add a false accounting entry or two. Her lies were huge. For example, in 2014, her tax return reported more than $100 million in revenue for her business, but she estimates the actual revenue that year was only $2 to $4 million. Similarly, defendant fabricated schedules listing her accounts receivable (AR), which was the primary collateral for her loans. By the end of

her scheme, she was providing AR schedules to the banks showing her AR was nearly $67 million when, in fact, it was a tiny fraction of that amount.

In short, defendant's fraud was not a one-time mistake or lapse in judgment on an otherwise unblemished record. Instead, she deliberately perpetrated a fraud every day of every year for the last decade. It is true that defendant does not appear to have hidden the money away or wasted it on things like gambling, drugs,[2] or luxury goods. But pouring the fraudulently obtained money back into a business that had no chance of success proved to be just as wasteful. Defendant's sentencing memorandum also downplays her lifestyle during the scheme. She paid herself a six-figure salary, funded by the money stolen from banks.[3] She spent more than $1.5 million to purchase and renovate a home in Phoenix toward the end of her scheme, and she owned another home in Phoenix and a cabin in Page. Through her business, she also had an apartment in China and owned a home in San Diego, both places she frequently travelled for work. Although one might expect a more extravagant lifestyle from someone who stole $50 million, defendant lived very comfortably.

These additional details demonstrate why defendant's crimes, despite her many positive attributes, are still among the most serious of economic crimes. Her scheme was long-running, complex, and resulted in a loss of more than $50 million. According to recent data collected by the United States Sentencing Commission, the median loss for

---

[2] Defendant claims in the PSR that she had a drinking problem from 2007-2015. PSR ¶ 58 (doc. 45). Defendant told the government during her confession in March 2016, however, that she was not addicted to drugs or alcohol and her recent sentencing memorandum affirmatively states she does not have a substance abuse issue. *See* Defendant's Sentencing Memorandum at 21. The reason for the inconsistency between the PSR and defendant's other statements is unclear. In any event, defendant's March 2016 admissions and sentencing memorandum confirm that she is not a candidate for BOP's substance abuse treatment program, nor is a departure for substance abuse warranted. *See* U.S.S.G. § 5H1.4 ("Drug or alcohol dependence or abuse ordinarily is not a reason for a downward departure.").

[3] Defendant claims in the PSR that she paid herself a yearly salary of $175,000. PSR ¶ 64 (doc. 45). Her tax returns suggest she was paid about $284,000 in 2012 and $300,000 in 2013, however. While defendant has admitted that much of what she reported in her returns was false, it is hard to imagine that defendant would report she earned more than she actually did, which would increase her tax liability.

offenses sentenced under U.S.S.G. § 2B1.1 was $130,301, and nearly 80% of all § 2B1.1 offenses involved loss amounts of $1 million or less.[4]  The loss amount here is nearly 40 times the median loss, and likely within the top one percent of loss amounts for § 2B1.1 offenses.  The recommended term of incarceration is necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### C.    Affording adequate deterrence

The recommended term of incarceration is necessary to afford adequate deterrence. The Ninth Circuit has repeatedly recognized the importance of deterrence in economic fraud cases such as this.  *See*, *e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1012 (9th Cir. 2010) (noting "the deterrence of white-collar crime" is "of central concern to Congress" and affirming 300-month sentence for defendant convicted in $40 million scheme).

The government agrees defendant is unlikely to reoffend and, thus, specific deterrence is not a concern.  But the importance of general deterrence in this case should not be ignored.  A sentence of probation or short custodial sentence would not adequately deter others from committing similar offenses.  Rather, it would signal to others that they can steal tens of millions of dollars without risking a significant term of incarceration.

### D.    Avoiding unwarranted sentence disparities

The recommended term of incarceration is also necessary to avoid unwarranted sentence disparities.  According to recent data collected by the United States Sentencing Commission, more than 50% of offenders sentenced under § 2B1.1 received a sentence below the applicable guidelines range, with an average downward variance of 10 months.[5] In this case, the recommended sentence of 84 months is a downward variance of 13 months from the low-end of the guidelines range of 97-121 months.

---

[4] United States Sentencing Commission, *Quick Facts: Theft, Property Destruction, and Fraud Offenses* (August 2016), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY15.pdf ("2B1.1 Quick Facts").

[5] 2B1.1 Quick Facts (noting, in fiscal year 2015, the average guidelines range minimum for 2B1.1 crimes was 34 months, and average sentence imposed was 24 months).

**III.    An extraordinary variance below 84 months is not justified.**

The parties and PSR writer all agree that some variance is appropriate in this case. But defendant goes much further, asking for an extraordinary variance to a sentence of probation. The Court should deny Defendant's request for probation for several reasons.

As an initial matter, defendant is not eligible for probation because bank fraud is a Class B felony. *See* 18 U.S.C. §§ 1344, 3559, 3561.

More importantly, probation (or a short custodial sentence) is not warranted. Defendant does not identify any factors that would support such an extraordinary variance from the Sentencing Guidelines range of 97-121 months. For example, defendant's remorse and acceptance of responsibility are largely accounted for in her Guidelines calculation. *See* PSR ¶¶ 25, 36-37 (doc. 45); *see also* U.S.S.G. § 5K2.0(d)(2) (acceptance of responsibility may be taken into account only under U.S.S.G. § 3E.1.1).

In addition, courts have held, and the Guidelines direct, that similar charitable efforts do not justify a large variance. *See*, *e.g.*, *United States v. Carlson*, 498 F.3d 761, 765 (reversing probationary sentence, holding while defendant's record of charitable activities was commendable, it was not so extraordinary as to justify a large variance); *see also* U.S.S.G. § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.").

Nor is the damage to defendant's business, family, and reputation resulting from her conviction a sufficient justification for an extraordinary variance. *Carlson*, 498 F.3d at 765 (noting such damage is not "anything out of the ordinary for individuals convicted of such crimes" and did not support a large variance).

Moreover, the need to make restitution does not justify an extraordinary variance. Appellate courts, including the Ninth Circuit, have considered similar arguments and squarely rejected them. *See United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir 2006) ("Restitution is desirable but so is the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white- and blue-collar offenses,

and limits on the ability of those with money or earning potential to buy their way out of jail."); *Treadwell*, 593 F.3d at 1012 (similar).

Further, defendant's medical issues do not appear to warrant the extraordinary variance she seeks. The Guidelines suggest that a downward departure is appropriate only where a defendant has an "extraordinary physical impairment" and is "seriously infirm." U.S.S.G. § 5H1.4. Appellate courts including the Ninth Circuit have interpreted those terms narrowly and repeatedly affirmed district court decisions in which courts have found AIDS, cancer, heart attacks, and various other terminal or life threatening conditions did not warrant significant departures or a non-custodial sentence. *E.g.*, *United States v. Monroe*, 106 F. App'x 604 (9th Cir. 2004) (kidney disease was not an extraordinary physical impairment); *United States v. Russell*, 156 F.3d 687, 694 (6th Cir. 1998) (collecting and summarizing cases, stating "it is not enough merely to have a disability to qualify for a downward departure under § 5H1.4," rather "the physical impairment must truly be 'extraordinary,'" and "§ 5H1.4 relief is extremely difficult to obtain").

The information provided by defendant to date does not support a particularized finding that she has an "extraordinary physical impairment" or is "seriously infirm" such that an exceptional departure under § 5H1.4 is warranted. *See United States v. Carey*, 895 F.2d 318, 324 (7th Cir. 1990) (in bank fraud case, vacating sentence because district court failed to make particularized findings regarding defendant's physical condition when departing downward but instead summarily concluded that defendant's age (62) and the fact that he had several surgeries for a brain tumor justified the departure). Rather, defendant's medical issues are one factor, among several, that justify a modest downward variance.[6]

///

///

---

[6] If defendant provides addition information regarding her condition before sentencing, the government may supplement its sentencing memorandum.

***

For all of these reasons, the government requests the Court grant a two-level downward variance and impose a sentence of 84 months, followed by three years of supervised release. The government also requests restitution be ordered in the amount of $50,672,469.96.

Respectfully submitted this 29th day of June, 2017.

    ELIZABETH A. STRANGE
    Acting United States Attorney
    District of Arizona

    *s/Mary Bridget Minder*
    M. BRIDGET MINDER
    PETER SEXTON
    Assistant U.S. Attorneys

**Certificate of Service**

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Lee Stein, Anne Chapman

*s/Gaynell Smith*
U.S. Attorney's Office